UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| BRAD HENDRIX, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:14-00052 |
| | ) Judge Sharp |
| DEKALB COUNTY BOARD OF | ) |
| EDUCATION, MARK WILLOUGHBY | ) |
| individually and in his official capacity, | ) |
| As Director of Schools for DeKalb | ) |
| County, Tennessee, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

In this action brought under 42 U.S.C. § 1983, Plaintiff Brad Hendrix alleges that Defendants Dekalb County Board of Education and Mark Willoughby retaliated against him after Plaintiff, in his role as a County Commissioner, voted against the purchase of land for new school construction. Defendants have filed a Motion for Summary Judgment (Docket No. 21), to which Plaintiff has responded in opposition (Docket No. 26), and Defendants have replied (Docket No. 28). For the reasons that follow, summarry judgment will be granted in favor of Defendants.

### I. Factual Background[1]

Plaintiff is a teacher for the DeKalb County Board of Education. The Director of Schools was Defendant Willoughby, who assumed that position in July 2006.

---

[1] Most of the facts presented by Defendants in their Statement of Undisputed Material Facts are undisputed by Plaintiff in whole or in part. For the facts that Plaintiff disputes or only partially admits, he has failed to comply with this Court's Local Rules that require "[e]ach disputed fact must be supported by specific citation to the record." L.R. 56.01(c). As a consequence, this Court considers such fact undisputed in accordance with both Local Rule 56.01(g) and Rule 56(e)(2).

1

As Director of Schools, Defendant Willoughby was the chief operating officer of the school system and ultimately responsible for its overall operation. He personally interviewed and made the hiring decisions regarding the central office staff and school principals. His job also included recommending tenure to the Board of Education, but he only rarely interviewed applicants for teaching positions, and generally did not interview persons for school-level positions other than that of principal.[2] That is, although Defendant Willoughby was ultimately responsible for hiring teachers, coaches and school personnel, he generally accepted the recommendation of the building principal on the appointment and assignment of personnel within the principal's particular school. Moreover, Defendant Willoughby generally did not involve himself in the day-to-day operation of an individual school, but left that responsibility to each principal who was to operate his or her school in accordance with school board policy.

Shortly after he became the Director, Defendant Willoughby learned that some teachers were taking vacation days during the school year and claiming sick time so that they would not lose pay. He advised all school personnel that the practice had to stop. While the employees remained free to attend to personal matters during school days (if they received principal approval) that time would either be charged against personal leave or taken as leave without pay.

Even though Plaintiff does not recall being told that sick days could not be used for vacation, he does recall being told that sick leave was to be used for illness. Nevertheless, Plaintiff admittedly used sick leave to take golf trips during instructional times but claims (without citation to the record) that he played golf on those occasions to relieve stress at the recommendation of his doctor.

---

[2] In fact, Defendant only interviewed Plaintiff when he applied for the Supervisor of Attendance position.

In August 2010, Plaintiff was elected to the DeKalb County Commission, and took office on September 1, 2010. In March 2011, the School Board sought approval from the Commission for the purchase of land to be used in the construction of a school. Plaintiff voted against the purchase of the property.

On December 9, 2011, Plaintiff, other teachers, and students went on a field trip to a Chuck E. Cheese restaurant in Murfreesboro, Tennessee. Plaintiff left the field trip early to attend a basketball game in Smithville, Tennessee. Dr. Billy Tanner, the Principal of Smithville Elementary School where Plaintiff worked claims that Plaintiff left without prior permission, a contention Plaintiff disputes (again without citation to the record). Regardless, Dr. Tanner recommended to Defendant Willoughby that Plaintiff be suspended for one day without pay for that conduct, which Defendant Willoughby approved. Plaintiff appealed his suspension, but it was affirmed by an administrative hearing officer. Plaintiff then appealed that decision to the school board, which upheld the decision but increased the period of suspension to three days.

From the date of the March 2011 land purchase vote until the Chuck E. Cheese incident on December 11, 2011, the only adverse job action Plaintiff identifies as retaliation for his vote was that his before-school car drop-off duties were taken away, and he was instead assigned after-school car pick-up duties. This meant that, instead of having to arrive 15 to 20 minutes early, he left 15 to 20 minutes later. Although Plaintiff believes that this alleged retaliation was orchestrated by Defendant Willoughby, he has no proof, circumstantial or otherwise, to support that belief, and Defendant Willoughby specifically denies being involved in the decision to change Plaintiff from drop-off to pick-up duties.

On May 11, 2012, Plaintiff was issued a Letter of Reprimand and Plan of Corrective Action.

3

The letter, signed by Defendant Willoughby, stated that Plaintiff had a history of leaving school and school activities early without obtaining permission and pointed to the Chuck E. Cheese incident as an example. The letter then went on to state that on April 18, 2012, Plaintiff attended an "Autism program" but left without good cause or permission. In fact, Plaintiff allegedly told a participant at the seminar that he had to leave early because he had a meeting with Defendant Willoughby. This was untrue. Plaintiff was informed that the letter would be placed in his personnel file and warned that this was a final notice "to refrain from this unprofessional and insubordinate behavior." (Docket No. 22-2 at 2). Plaintiff refused to sign the letter.

In May of 2013 the Supervisor of Attendance position in the central office was posted as a result of the incumbent's decision to retire at the end of the 2012-13 school year. That position requires either an educator license endorsement code "094," which is specific to Supervisor of Attendance, or a school administrator's license or endorsement.

Three applicants applied for the position: Plaintiff, David Gash, and Joey Reeder. All three were facially qualified: Mr. Reeder had held a Supervisor of Attendance endorsement for a number of years; Mr. Gash had an administrator's endorsement; and Plaintiff had an administrator's endorsement, but had also filed for a Supervisor of Attendance endorsement by the time he applied and received the endorsement a few days after his application was filed. Of the three candidates, Mr. Reeder was the only one who had prior experience as a Supervisor of Attendance, having served in such capacity from June 1997 to July 1999 under a previous Director of Schools.

Defendant Willoughby selected Mr. Reeder as the Supervisor of Attendance. He claims that he chose Mr. Reeder because he was the most qualified and the only one with prior experience in the position. Defendant Willoughby also claims that, had he not appointed Mr. Reeder, he would

4

have selected Mr. Gash because he had prior experience as an administrator (7 years as the Assistant Principal of the DeKalb County High School), whereas Plaintiff had no experience as an administrator. Moreover, Defendant Willoughby asserts that even if Plaintiff were the sole applicant, he would not chosen him but rather would have reposted the job because, as became apparent during the appeal of the suspension, Plaintiff had a history of leaving school without permission to attend to personal matters.

Plaintiff can identify no retaliatory actions that occurred between the letter of reprimand of May 11, 2012, and his failure to receive the Supervisor of Attendance position in June 2013. While Plaintiff sought a coaching position within this time frame, he has presented no evidence which suggests that Defendant Willoughby had anything to do with that hiring decision.

Plaintiff hired an attorney in March 2012. This suit was filed on May 29, 2014. In his Complaint, Plaintiff alleges that after he voted against the land purchase in March 2011, he "was subjected to harassment and retaliation by Mr. Willoughby and Mr. Tanner" in a myriad of ways (Complaint, Docket No. 1 ¶¶ 11 & 12-31), although Mr. Tanner is not named as a Defendant. During his deposition, after repeated questioning, Plaintiff identified only the above-discussed incidents as supporting his claim for retaliation.

## II. Application of Law

When this Court is called upon to rule on a Motion for Summary Judgment, it generally suffices to note that the standards governing such motions are well known and need not be reiterated. However, given the approach that Plaintiff has taken in this case, a slightly further exposition of the standards is appropriate.

A party may obtain summary judgment if the evidence establishes there are not any genuine

5

issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox Cnty. Sch. Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n. 4 (6th Cir.1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Here, in response to Defendant's Motion for Summary Judgment, Plaintiff devotes well over a page of his brief setting forth the standards governing summary judgment but, in practice, only pays them lip service. Not only did he not provide citations to the record for what he claims to be disputed facts, he states that "'in [his] verified complaint . . . [he] put forward a number of specific nonconclusory allegations and identified affirmative evidence that could support a jury verdict at

trial.'" (Docket No. 26 at 10 quoting, Thaddeus-X v. Blatter, 175 F.3d 278, 294 (6th Cir. 1999)). The fundamental problem with this assertion is that, while Plaintiff's Complaint contains 28 paragraphs in the "Facts" section (at least the last six of which are conclusory), the Complaint is not verified and thus the "facts" presented are nothing more than allegations.

**A.**

Turning to the merits, retaliation claims under the First Amendment are analyzed under a burden shifting framework similar to the McDonnell Douglas paradigm. Wenk v. O'Reilly, 783 F.3d 585, 593 (6th Cir. 2015); Garvey v. Montgomery, 128 Fed. App'x 453, 455 (6th Cir. 2005). "A plaintiff must first make a prima facie case of retaliation, which comprises the following elements: '(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two' that is, the adverse action was motivated at least in part by his protected conduct." Dye v. Office of the Racing Comm'n, 702 F.3d 286, 294 (6th Cir. 2012) (quoting Scarbrough v. Morgan Cty. Bd. of Educ., 470 F.3d 250, 255 (6th Cir. 2006)). "If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate 'by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.'" Id. (quoting Eckerman v. Tenn. Dep't of Safety, 636 F.3d 202, 208 (6th Cir. 2010)). "'Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant.'" Id. at 294-94 (quoting Eckerman, 636 F.3d at 208). "Unlike in the McDonnell Douglas burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." Id. at 295; accord, Wenk, 783 F.3d

7

at 593.

Plaintiff easily meets the first two elements of a prima facie case, at least with respect to the decision not to hire him as Supervisor of Attendance. First, given the "content, form, and context" of his vote not to approve the purchase of land, his statement was unquestionably a matter of public concern within the meaning of Connick v. Meyers, 461 U.S. 138, 147-48 (1983). Second, while "[t]he term 'adverse action' arose in the employment context and has traditionally referred to actions such as 'discharge, demotions, refusal to fire, nonrenewal of contracts, and failure to promote'" the Sixth "Circuit has held that any action that would deter a person of ordinary firmness from exercising protected conduct will suffice, which may include harassment or publicizing facts damaging to a person's reputation." Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 724 (6th Cir. 2010) (quoting Thaddeus-X, 175 F.3d at 396). Plaintiff has not, however established causation.

**B.**

Plaintiff's retaliation claims are brought under 42 U.S.C. § 1983 and therefore governed by a one-year statute of limitations. Johnson v. Memphis Light Gas & Water Div., 777 F.3d 838, 843 (6th Cir. 2015); Roberson v. Tennessee, 399 F.3d 792, 794 (6th Cir.2005). The only alleged retaliatory action that occurred within one year of the filing of suit was the decision not to hire Plaintiff as the Supervisor of Attendance. However, that decision occurred more than 27 months after the vote on the land purchase. This nexus is insufficient as a matter of law to establish causation. See Crane v. Mary Free Bed Rehab. Hosp., 2015 WL 8593471, at *9 (6th Cir. Dec. 11, 2015) (twenty-two months and seven months between employee's activity and promotion decision "is not 'very close' in time and without more cannot sustain an inference of a causal connection"); Evans v. Prospect Airport Serv., Inc., 286 Fed. App'x 889, 895 (6th Cir. 2008) (no "reasonable

8

inference of retaliation" could be drawn from the fact that plaintiff was fired almost a year after he filed an EEOC complaint and seventeen months after he filed his initial EEOC complaint); Giles v. Univ. of Toledo, 285 Fed. App'x 295, 305 (6th Cir. 2008) (no temporal connection between protected activity and termination where twenty-three months elapsed after filing EEOC charge and seventeen months after filing complaint) .

Given the lack of causation between his vote and the hiring of the Supervisor of Attendance, Plaintiff attempts to salvage his retaliation claim under a continuing violation theory which allows courts to "consider as timely all relevant violations 'including those that would otherwise be time-barred.'" Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth., 480 F.3d 410, 416 (6th Cir. 2007) (citation omitted). In so doing, Plaintiff relies upon the following language from the Supreme Court's decision in National Railroad Passenger Corporation v. Morgan, 536 U.S. 101 (2002):

> [i]t is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold, as have some of the Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct.

Id. at 117-18.

Plaintiff neglects to consider that the Sixth "Circuit employs the continuing violations doctrine most commonly in Title VII cases, and rarely extends it to § 1983 actions." Agrawal v. Montemagno, 574 F. App'x 570, 575 (6th Cir. 2014). More fundamentally, he fails to acknowledge "[t]he Supreme Court's decision in Morgan largely curtailed the continuing-violations theory when applied to 'discrete discriminatory acts,'" Austion v. City of Clarksville, 244 F. App'x 639, 647 (6th Cir. 2007), even though "[t]he second category of continuing violations, involving a longstanding and demonstrable policy of discrimination, [was] not implicated by Morgan, Sharpe v. Cureton, 319

9

F.3d 259, 268 (6th Cir. 2003). However, "[t]o establish this [second] category of continuing violation, '[plaintiff] must demonstrate something more than the existence of discriminatory treatment in his case,'" and "[t]he preponderance of the evidence must establish that some form of intentional discrimination against the class of which plaintiff was a member was the company's standing operating procedure." Sharpe, 312 F.3d at 268-69. "Generally this exception is strictly construed and is satisfied only where the defendant has a known policy or rule supporting discrimination." Austion, 244 F. App'x at 647.

In this case, Plaintiff does not claim to be in a class that was subjected to long-term discrimination or retaliation, nor does he point to any policy or rules of Defendant that support discrimination or retaliation. Regardless, the arguments he raises in support of his continuing violation theory are not supported by the record.

Plaintiff claims that "Defendant Willoughby began his pattern of retaliatory actions with a move that in and of itself might not be actionable, that is the removal of [Plaintiff] from the morning drop-off duty which he had been working for a period of several years." (Docket No. 26 at 8). However, the only evidence in the record is that Defendant Willoughby was not involved in that decision, and Plaintiff offers no proof to the contrary. Similarly, Plaintiff points to the alleged fact that he, unlike other teachers, was required to get permission when leaving the school early, but again that was a decision made by Dr. Tanner, not Defendant Willoughby.

Plaintiff next cites the deposition testimony of "Markus Lyons" for the proposition that Plaintiff had permission to leave Chuck E. Cheese to attend his child's basketball game. (Docket No. (Id. at 11). Presumably, Plaintiff means the deposition testimony of Lynus Martin who claims to have overheard "Ms. Knowles" tell Plaintiff, "you're free to go, free to leave." (Docket No. 26-2

10

Martin Depo. at 19). Karen Knowles was the Vice Principal of Smithville Elementary, but there is no evidence to suggest that Defendant Willoughby was aware that Ms. Knowles gave Plaintiff permission to leave early. In fact, Defendant Willoughby's decision was based on a letter from Dr. Tanner in which the latter specifically stated that Plaintiff was required to get permission from him to leave early, and that, rather than seeking such permission, Plaintiff told the bookkeeper who, in turn, told Ms. Knowles who, in turn, thought that Plaintiff had been given permission from Dr. Tanner.

Plaintiff next claims that he "had no reason to allege that he left the seminar early to meet with Defendant Willoughby because he was going to attend a County Commission meeting which was being held to appoint a new Activities Coordinator for the new County Complex." (Docket No. 26 at 8). Even if Plaintiff had no motive to say he was meeting with Defendant Willoughby, he admitted in his deposition that he did not receive permission from either Dr. Tanner or Ms. Knowles to leave the workshop early; rather, he had "permission" from the "person holding the workshop" who said "that will be fine, we're not going over anything else." (Docket No. 22-5, Pf. Depo. at 67). Moreover, Plaintiff's reprimand was for his "past actions in leaving school and school activities early without obtaining proper permission, as well as [his] admitted failure to abide by policies pertaining to six leave and personal leave." (Docket No. 22-2 at 1).

Finally, Plaintiff cites Defendant Willoughby's declaration for the proposition that "[d]espite [Plaintiff's] experience as a coach and the fact that he applied for several open coaching positions, Mr. Willoughby did not appoint him to any of the coaching position for which he applied despite his admission that he appointed coaches." (Docket No. 26 at 9). That is a mischaracterization of Defendant Willoughby's declaration:

11

> I understand that [Plaintiff] claims I retaliated against him by not appointing him to certain coaching positions he applied for after he was elected to the county commission. I was not even aware that Hendrix applied for coaching positions since the application is not made to the central office but to either the head coach or the school Principal. There are, on occasion, coaching positions which became vacant and which teachers from outside the school system would apply through the central office, but in such instances the applications are for a teaching positions with coaching duties attached to the teaching positions. However, I was not involved in these interviews. If the coaching applicant is already teaching in the system, they apply directly to the Principal or head coach since they do not have to be hired as a teacher in the system. While I technically appointed coaches, the appointments were based upon the recommendations of the Principals who rarely if ever shared with me the name of the candidates. Typically, the recommendation would come to the central office only with the name of the applicant that was recommended for the position.

(Docket No. 23, Willoughby Decl. ¶ 8).

### C.

The lack of factual support for a continuing violation theory aside, Plaintiff's retaliation claims based on those alleged violations fail for lack of causation. The first allegedly retaliatory action after the vote on the land purchase that can be attributed to Defendant Willoughby was his approval of the one day suspension for the Chuck E. Cheese incident some nine months after the land purchase vote. The other two decisions that can be fairly attributed to Defendant Willoughby – the letter of reprimand and the refusal to hire Plaintiff as Director of Attendance – occurred some fourteen and twenty-six months, respectively, after the vote. In the absence of anything more, the temporal proximity between those decisions and Plaintiff's vote on the land purchase is too remote to show causation. See, Nicholson v. City of Clarksville, 530 F. App'x 434, 448 (6th Cir. 2013) (collecting cases for the proposition that a "time period greater than six months, without more, is not a sufficiently short period of time to satisfy the causal connection element of a retaliation claim"); Clay v. United Parcel Serv., Inc., 501 F.3d 695, 718 (6th Cir. 2007) ("temporal proximity

alone' of approximately six months "is not enough to show a causal connection here").

Further, and as already pointed out, many of Plaintiff's complaints have to do with decisions made by Dr. Tanner, who is not a defendant herein. However, under Section 1983, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of respondeat superior." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). Therefore, a "'supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it.'" Peatross v. City of Memphis, 2016 WL 1211916, at *6 (6th Cir. Mar. 29, 2016) (emphasis in original) (quoting Shehee v. Luttrell, 199 F. 3d 295, 299 (6th Cir. 1999)). The Sixth Circuit has "interpreted this standard to mean that 'at a minimum,' the plaintiff must show that the defendant 'at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" Id.

Except for the Chuck E. Cheese incident, the reprimand, and the failure to hire Plaintiff into Attendant Supervisor position – all of which occurred many months after the property vote – Plaintiff has wholly failed to show any personal involvement by Defendant Willoughby. The fact that Defendant Willoughby is in charge of the "overall operations" of the school system is insufficient to impose liability under Section 1983. See, Tindell v. Pennsylvania, 398 F. App'x 696, 698 (3rd Cir. 2010) ("claiming that [defendant] 'is legally responsible for the overall operation'" of correctional facility does not show "personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior"); Altland v. Wetzel, 2015 WL 5530223, at *8 (M.D. Pa. Sept. 18, 2015) ("suing defendant . . . because she was 'responsible for the operation of [correctional facility] is, in essence, nothing more than an assertion of respondeat superior

liability"); Jones v. Culliver, 2010 WL 3339466, at *4 (S.D. Ala. Apr. 29, 2010) ("Plaintiff's claim against Defendant Culliver based on his responsibility for the overall operations of the prison fails to state a claim upon which relief can be granted because it is seeks to hold defendant Culliver liable on a respondeat superior basis").

Finally, Plaintiff argues that "all of Defendant Willoughby's justifications for the actions he took against and involving [Plaintiff] are questions concerning his [Defendant Willoughby's] state of mind," (Docket No. 26 at 6), and thus present fact issues inappropriate for summary judgment. Although credibility determinations are for a jury to make, "'the prospect of challenging a witness['] credibility is not alone enough to avoid summary judgment[.]" Goodwin v. City of Painseville, 781 F.3d 314, 323 (6th Cir 2015) (quoting Dugan v. Smerwick Sewerage Co., 142 F.3d 398, 406 (7th Cir. 1998)). Rather, and as the Supreme Court made clear in both Anderson and Celotex, when the moving party comes forward with evidence showing the absence of a need for a trial, *i.e.*, the lack of a genuine issue of material fact, the non-movant must come forward with some evidence to show the need for trial. See, Anderson, 477 U.S. at 250 (at summary judgment, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party"); Celotex, 477 U.S. at 322-23 (" In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case

14

necessarily renders all other facts immaterial.").

A court "need not scour the record or make a case for a party who has failed to do so on his own behalf, but even so, [a court is] still obliged to protect a viable cause of action that a plaintiff has in fact raised." Shorts v. Bartholomew, 255 F. App'x 46, 50 (6th Cir. 2007). This Court has considered the entire record, including Plaintiff's deposition testimony (supplied by Defendants), but finds insufficient evidence from which a reasonable jury could conclude that Plaintiff was retaliated against because he voted against the land purchase in his role as a County Commissioner. In fact, on the only alleged retaliatory act which took place within the statute of limitations, the record reflects that Defendant chose the individual who not only had the specific license for Supervisor of Attendance but who also had experience in that position.

### III. Conclusion

On the basis of the foregoing, the Motion for Summary Judgment filed by Defendants will be granted. An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE